899 F.Supp. 416 (1995)
Mark DOTZLER, Plaintiff,
v.
Ross PEROT, et al., Defendants.
Kevin LAUGHLIN, et al., Plaintiffs,
v.
Ross PEROT, et al., Defendants.
Nos. 4:94CV00887 GFG, 4:94CV00888 GFG.
United States District Court, E.D. Missouri, Eastern Division.
September 1, 1995.
*417 Mark Dotzler, St. Louis, MO, pro se.
Frank N. Gundlach, Armstrong and Teasdale, St. Louis, MO, Craig W. Budner, Kim J. Askew, Hughes and Luce, Dallas, TX, for defendants Ross Perot, Perot Petition Committee, Mark Alan Blahnik, Russ Melbye.
W. Dennis Cross, David S. Ladwig, Morrison and Hecker, Kansas City, MO, for defendant Calahan & Gibbons Group.
Alene V. Haskell, Husch and Eppenberger, St. Louis, MO, Lisa A. Kainec, Millisor and Nobil, Cleveland, OH, for defendant U.S. Datalink, Inc.
*418 G. Carroll Stribling, Ziercher and Hocker, St. Louis, MO, for defendant Equifax Credit Information Services.
Daniel T. Rabbitt, Jr., Rabbitt and Pitzer, St. Louis, MO, Jerome R. Doak, Jones and Day, Dallas, TX for defendant TRW, Inc.
Alan C. Kohn, Partner, Rebecca S. Stith, Associate, Kohn and Shands, St. Louis, MO, for defendant Sandra Stone McClure.

MEMORANDUM AND ORDER
GUNN, District Judge.
This matter is before the Court on the motions of defendants Ross Perot, Mark Alan Blahnik, and the Callahan & Gibbons Group to dismiss for lack of personal jurisdiction. For the reasons set forth below, the motions are granted.
Mark Dotzler, Kevin Laughlin, Edward Dyck and Carrie Alspaw filed separate pro se complaints against defendants Ross Perot, the Perot Petition Committee ("PPC"), Mark Alan Blahnik, the Callahan & Gibbons Group ("C & G"), U.S. Datalink, Inc., Equifax Credit Information Services, Inc., TRW, Inc., Russ Melbye, and Sandra Stone McClure. Dotzler's complaint was filed as No. 4:94CV00887 GFG. The complaint filed by Laughlin, Alspaw and Dyck was assigned No. 4:94CV00888 CAS. This Court consolidated the two actions.
According to the complaints, Laughlin, with the support of Perot's representatives in Dallas, organized a group called "Missouri for Perot" to circulate petitions in order to get Perot's name on the 1992 presidential ballot as an independent candidate. Laughlin, Dyck and Dotzler developed a "Petition Pak," which contained biographical information about Perot, to distribute in Missouri and began to circulate petitions in the state. The complaints allege that Blahnik, acting as Perot's agent, hired C & G in April or May of 1992 to assist with the "security" of the petition drive. C & G investigated plaintiffs and allegedly was paid by Perot through the PPC. Plaintiffs claim C & G conducted inquiries into their consumer credit files and obtained information on Dyck and Dotzler from TRW and U.S. Datalink on May 5, 1992. Plaintiffs further allege that C & G illegally obtained their full credit reports from Equifax through the use of an access code belonging to Orix Credit Alliance on May 7, 1992.
In late April 1992, Laughlin was notified that he was being replaced as the state contact person by McClure. Plaintiffs allege that McClure developed and maintained a close working relationship with Perot and the PPC and that she later became a salaried employee. On May 19, 1992, Laughlin and Dyck attended a meeting with McClure, Russ Melbye and others at the petition drive headquarters in St. Louis. At the meeting, Laughlin and Dyck received a document ("the May 19 document") which purported to remove Laughlin, Dyck and Dotzler from their roles in the Missouri for Perot organization for various forms of misconduct. Plaintiffs claim the allegations in the May 19 document are false.[1] McClure allegedly instructed Laughlin and Dyck to sign letters of resignation which had been prepared for them and Laughlin and Dyck were told that they would not be allowed to leave the room until they signed the letters. Laughlin and Dyck allege that they were forced to remain in the room for about one-half hour before they were allowed to leave.
Thereafter, at a May 29, 1992 news conference, McClure announced that the State of Missouri had to be repetitioned and that seven of the eleven original electors, including plaintiffs, had to be replaced. Perot allegedly supported McClure's repetition efforts, and Perot's administrative assistant, Joe Grant, allegedly made statements to the news media indicating Perot's support for the effort. McClure stated that Laughlin and Dyck were unacceptable as electors because: (1) they had refused to sign the declaration of candidacy forms; (2) Dyck engaged in financial misconduct in connection with the petition drive; (3) Laughlin and Dyck refused to sign a loyalty oath; and (4) Laughlin had mishandled funds and mismanaged the petition drive. Laughlin and Dyck allege that these statements were false and were made with knowledge of their falsity. *419 McClure's statements were subsequently published in Missouri newspapers.
The complaints allege, inter alia, that Perot, PPC, Blahnik, and C & G violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681a-1681t, by knowingly and willfully obtaining information on plaintiffs from a consumer reporting agency, Equifax, under false pretenses (Count I), and that Perot, PPC and C & G invaded plaintiffs' privacy by obtaining consumer information from Equifax for impermissible purposes (Count VIII). Dotzler, Dyck and Laughlin assert that Perot, PPC, McClure and Melbye defamed them by publishing the May 19 document with knowledge that the allegations contained therein were false (Count IX). Laughlin and Dyck allege that McClure knowingly made several false and defamatory statements to the press and to other volunteers and that in so doing, McClure was acting as the agent of Perot and the PPC (Count X, Laughlin complaint). Laughlin and Dyck also assert a claim of false imprisonment based on the May 19, 1992 incident and claim that McClure and Melbye were acting as agents of Perot and the PPC at the time of the incident (Count XI, Laughlin complaint). Finally, all plaintiffs allege that Perot failed to exercise reasonable control over his agents (Count X, Dotzler complaint; Count XII, Laughlin complaint).
C & G, Blahnik, and Perot have moved to dismiss the claims against them for lack of personal jurisdiction. Pursuant to this Court's order, Dotzler filed a letter response. Document 61. Laughlin, Dyck and Alspaw initially responded to the motions pro se. No. 4:94CV00888 GFG, Document 33. They have now retained counsel, and the Court permitted them to conduct discovery on the issue of jurisdiction and file a supplemental response. Document 57.

Personal Jurisdiction
A party seeking to invoke federal jurisdiction must establish the existence of jurisdiction. Newhard, Cook & Co. v. Inspired Life Centers, Inc., 895 F.2d 1226, 1228 (8th Cir.1990). A court may rely on pleadings, affidavits and deposition testimony to determine whether jurisdiction exists. Piper v. Kassel, 817 F.Supp. 802, 804 (E.D.Mo.1993). When relying on these materials, a court must view the facts in the light most favorable to the nonmoving party. See Watlow Elec. Mfg. Co. v. Patch Rubber Co., 838 F.2d 999, 1000 (8th Cir.1988). "[J]urisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." Dakota Indus. v. Dakota Sportswear, 946 F.2d 1384, 1387 (8th Cir.1991). Rather, "[t]o defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." Id.
Federal courts engage in a two-step analysis to determine whether personal jurisdiction exists over nonresident defendants: (1) is the state long-arm statute, here Mo.Rev. Stat. § 506.500, satisfied; and (2) is the exercise of jurisdiction over the nonresident defendants consistent with the due process clause of the Fourteenth Amendment. See Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus., 63 F.3d 694, 697 (8th Cir. 1995).
To the extent relevant here, § 506.500 authorizes Missouri courts to exercise jurisdiction over nonresident defendants who transact business within the state or commit tortious acts within the state. The Missouri Supreme Court has construed the long-arm statute as extending the jurisdiction of Missouri courts, "within the specific categories enumerated in the statutes, to the full extent permitted by the due process clause of the Fourteenth Amendment." State ex rel. Metal Serv. Center, Inc. v. Gaertner, 677 S.W.2d 325, 327 (Mo.1984); see Piper, 817 F.Supp. at 804. Missouri courts have liberally construed the statutory requirement of transacting business within the state for the purpose of the long-arm statute. See Precision Constr. Co. v. J.A. Slattery Co., 765 F.2d 114, 117 (8th Cir.1985) (corporation with two resident salesmen in Missouri which shipped belts to Missouri purchaser transacted business in Missouri within meaning of long-arm statute). Likewise, Missouri courts have construed the phrase "commission of a tortious act within the state" broadly to include extraterritorial acts that produce actionable consequences in Missouri. Institutional Food Mktg. Associates, Ltd. v. Golden State *420 Strawberries, Inc., 747 F.2d 448, 453 (8th Cir.1984). In either circumstance, the statute requires the cause of action to arise from the performance of acts within the state. Fairbanks Morse Pump Corp. v. ABBA Parts, Inc., 862 F.2d 717, 719-20 (8th Cir. 1988).
Under the due process clause, courts may exercise jurisdiction over nonresident defendants only if the defendants have "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (internal quotations and citations omitted). In assessing the sufficiency of the contacts, federal courts focus on the relationship among the defendant, the forum, and the litigation. Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). The nonresident defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). The "test is met if a defendant has deliberately engaged in activities, such as having created continuing obligations, within a state, and such actions invoke the benefits and protections of a state's laws." Minnesota Mining & Mfg., 63 F.3d 694, 697.
"Once it has been decided that a defendant purposefully established contacts with a forum state, these contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction would agree with fair play and substantial justice." Id. The primary factors are: (1) the nature and quality of the contacts; (2) the quantity of the contacts; and (3) the relation of the cause of action to the contacts. The secondary factors are: the interest of the forum state in the litigation and the convenience or inconvenience to the parties. Id.
C & G argues that the Court lacks personal jurisdiction over it because the complaints fail to allege any specific conduct or acts by C & G within Missouri from which the causes of action against it could have arisen. Documents 12 & 17. In support of its motion, C & G has submitted a copy of the seven-page report on the Missouri electors it provided to the PPC and an affidavit from John J. Callahan. Callahan's affidavit states that C & G is a California corporation with its principal place of business in San Francisco, that C & G does not have any general business contacts with the State of Missouri, and that C & G did not provide physical security at the PPC volunteer site in Missouri. Callahan aff. ¶¶ 3-9.
Callahan concedes that C & G conducted background checks on the plaintiffs at the request of Russ Melbye of the PPC. Id. at ¶ 10. The checks consisted of verifying the names and addresses given by the plaintiffs and conducting searches of public court records for criminal and civil matters involving each elector. Id. at ¶ 11. C & G performed the checks by verifying names and addresses through U.S. Datalink, and by obtaining information from public civil and criminal court records through a private investigation firm called North American Advisory. Id. at ¶¶ 13-14. C & G did not obtain a consumer report, a consumer credit report or any type of consumer information on the plaintiffs from any source. Id. at ¶ 15. Callahan denies that C & G used Orix Credit Alliance's access code to obtain consumer information on plaintiffs. Id. at ¶ 16. According to Callahan, C & G had no contact with Missouri in connection with the services it provided to the PPC. Id. at ¶¶ 18-24.
C & G also submitted an affidavit from Jeffrey A. Jones, systems administrator for U.S. Datalink. Document 36, exh. A. Jones explains the types of services U.S. Datalink provides to its subscribers. Id. at ¶¶ 2-4. Jones states that C & G did not request credit information on plaintiffs and that no such information was provided to C & G by U.S. Datalink. Id. at ¶ 4. Rather, U.S. Datalink did an address update search for C & G to verify the current and former addresses of plaintiffs. Id. at ¶¶ 5-6.
Perot and Blahnik argue that the Court lacks personal jurisdiction over them because the complaints do not establish any contacts *421 by either of them with Missouri in relation to the cause of action. Perot and Blahnik maintain that they neither transacted business within Missouri nor committed a tortious act within the state. Perot further asserts that plaintiffs' attempt to subject him to liability for the acts of third parties under an agency theory lacks factual support. Documents 21 & 25.
Perot and Blahnik have submitted affidavits in support of their motions. Blahnik states that he has not had any general business contacts with Missouri, that he did not hire C & G for any purpose, that he neither knew of nor directed any activity of C & G in or related to Missouri, and that he never communicated with C & G regarding plaintiffs or any aspect of the Missouri for Perot operation. Blahnik aff. at ¶¶ 3-8. Blahnik further avers that he never sent any information to C & G in Missouri, that he never directed C & G to perform any services in Missouri, that he never engaged in any tortious act in Missouri, and that he never made telephone calls or sent correspondence to Missouri in connection with the allegations of the complaints, and that he did not receive calls or correspondence from Missouri in connection with plaintiffs' allegations. Id. at ¶¶ 9-12. Finally, the Blahnik states that he has not met any member of Missouri for Perot, that he did not direct any of the activities taken by Missouri for Perot, and that he has never visited the offices of Missouri for Perot. Id. at ¶ 13.
Perot's affidavit also denies any general business contacts with Missouri. Perot aff. at ¶¶ 3-7. Perot states that he maintained no contact with the individual members of Missouri for Perot, and that the PPC, Blahnik, McClure or Melbye did not act as his agents or subagents in connection with the allegations in the complaint. Id. at ¶¶ 9, 11. Perot further avers that he never employed McClure, paid her a salary, or directed her activities, and that he exercised no control over the PPC, Blahnik, Melbye, McClure or Missouri for Perot. Id. at ¶¶ 11-13. Perot states that he never directed anyone to conduct an investigation of plaintiffs, that he did not instruct or employ anyone to obtain consumer credit reports on plaintiffs, that he did not direct anyone to remove plaintiffs from their positions in Missouri for Perot, and that he did not direct anyone to make any statements about plaintiffs. Id. at ¶¶ 16-19.

1. Dotzler
In response to the motions to dismiss, Dotzler filed a letter with the Court in which he stated:
Ross Perot, Mark Blahnik and Callahan & Gibbons had the required minimum contacts with Missouri through Ross Perot's deliberate yet reckless decision not to use the United States Secret Service for security and investigative activities in connection with his 1992 Presidential Campaign and to instead hire his own people to act like the Secret Service upon citizens of Missouri and other States.
Ross Perot's directive and his employees/agents resulting actions should permit this court to fairly exercise personal jurisdiction over the actions of Ross Perot, Mark Blahnik and Callahan & Gibbons.
Document 61. Dotzler attached to this letter excerpts from a Blahnik's deposition taken in a Maryland action. Blahnik testified that he hired C & G to provide security for activities related to the Perot campaign in Maryland. Id.; Blahnik depo. at 17-20. Blahnik did not state that he took similar actions in connection with Missouri, however.
The Court concludes that Dotzler's response is insufficient to establish personal jurisdiction over C & G, Blahnik or Perot. Dotzler has failed to come forward with any evidence to refute the affidavits submitted by defendants in support of their motions to dismiss. The unrefuted affidavits establish that the defendants did not transact business or commit a tortious act within Missouri. Thus, Dotzler has failed to satisfy the long-arm statute. Assuming that Dotzler could satisfy the long-arm statute, the affidavits indicate that defendants did not have sufficient contacts with Missouri to enable the Court to exercise personal jurisdiction over them in connection with this action. The Court therefore dismisses Dotzler's complaint against C & G, Blahnik and Perot for lack of personal jurisdiction.

*422 2. Laughlin, Dyck & Alspaw
Laughlin, Dyck and Alspaw initially responded to the motions to dismiss pro se and attached an affidavit from Edward Dyck. Document 33. Dyck states that Clayton Mulford, former counsel to the PPC, admitted that C & G provided PPC with "credit histories of some of the state coordinators". Id. at ¶ 3. Dyck asserts that Mulford identified Blahnik as an individual who authorized the "investigations of campaign workers". Id. at ¶ 4. Dyck also refers to newspaper articles which reported that Perot campaign officials "acknowledged that security firms made credit checks on their behalf of several volunteers" and that Perot admitted that "private investigators were hired to investigate campaign workers." Id. at ¶¶ 5-6. Dyck avers that C & G admitted that it used U.S. Datalink to obtain information pertaining to plaintiffs; that records from TRW "reflect that my credit history was accessed through U.S. Datalink on May 5, 1992"; that records from Equifax "reflect that my credit history was accessed through Orix Leasing on May 7, 1992"; and that some of the information transmitted by C & G "could only have been obtained from my Equifax records". Id. at ¶¶ 7-10. The affidavit concludes by stating that plaintiffs "hold a reasonable belief that Defendant C & G obtained their credit histories at the request of Defendants Perot and Blahnik, and that some of the information which Defendant C & G transmitted to Defendant PPC and Defendant Perot was derived through the use of the Orix Leasing access code." Id. at ¶ 11.[2] In a supplemental affidavit, Dyck provided a copy of a credit profile from TRW, which indicates that U.S. Datalink made an inquiry on May 5, 1992. The entry is followed by the code "A/U". Document 44, exh. A-1.[3]
Plaintiffs have conducted discovery and supplemented their response to the motions to dismiss with the assistance of counsel. Document 70. The Court will discuss the response as it relates to the individual defendants.

A. C & G
Plaintiffs argue that the Court may exercise personal jurisdiction over C & G under the Missouri long-arm statute because C & G committed a tortious actimpermissibly inquiring into plaintiffs' credit filesthe effects of which were felt in Missouri. Document 70 at 4. Plaintiffs correctly assert that a tortfeasor need not be present in Missouri to commit a tortious act within the state. See Peabody Holding Co. v. Costain Group PLC, 808 F.Supp. 1425, 1433 (E.D.Mo.1992). As previously noted, the long-arm statute allows courts to exercise personal jurisdiction over a nonresident tortfeasor who commits extra-territorial tortious acts which have consequences within the state. Id. Plaintiffs must make a prima facie showing that the defendant has in fact committed the tort alleged in the complaint. Id.
Plaintiffs maintain that they have made a prima facie showing that C & G violated the FCRA and committed the tort of invasion of privacy (Counts I & VIII) by illegally inquiring into their credit files with Equifax. As support, plaintiffs point to the allegations of their complaint and their supplemental affidavits. Document 70, exhs. 1-3. Plaintiffs maintain that the evidence submitted indicates that C & G accessed plaintiffs' credit files through an access device and a security code of Orix Leasing. Document 70 at 5. Plaintiffs have filed copies of credit reports indicating that Orix Leasing requested a credit history on each of them on May 7, 1992. Id. exh 1, A; exh. 2; exh. 3, A, B. Further, plaintiffs correctly point out that the C & G reports contain some of the same information as is contained in Equifax credit reports. Id. at 5-6. Accordingly, plaintiffs contend that C & G could not have obtained this information from any source other than their credit histories. Id. at 6-7.
The Court concludes that plaintiffs have failed to make a prima facie showing that C & G engaged in any illegal or tortious *423 activity outside of Missouri which caused harm within the state. Plaintiffs have failed to come forward with any evidence to support their assertions concerning C & G's use of the Orix Leasing access code to obtain their credit histories. Though plaintiffs are not required to establish personal jurisdiction by a preponderance of the evidence at this stage of the proceeding, they must provide some evidence to support their allegations. Speculation and conjecture in the form of an affidavit are not sufficient to discharge this burden.
Moreover, the evidence indicating that U.S. Datalink used TRW's address update service to provide information to C & G does not establish a violation of the FCRA or the tort of invasion of privacy. The information U.S. Datalink obtained through this service is not a "consumer report" within the meaning of the FCRA. 15 U.S.C. § 1681a(d); see Hoke v. Retail Credit Corp., 521 F.2d 1079, 1081 (4th Cir.1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 98 (1976). Even assuming the information is a consumer report as defined by the FCRA, there is no evidence that C & G obtained the information under false pretenses. See DiCarlo v. Maryland Auto Ins. Fund, 855 F.Supp. 823, 824 (D.Md.1994) (liability under § 1681q requires evidence that requestor of information acted under false pretenses). Further, the information in the report is readily available in public documents and thus cannot be considered private.
Plaintiffs cite Bils v. Nixon, Hargrave, Devans & Doyle, 880 P.2d 743 (Ariz.Ct.App. 1994) to support their claim. Bils is distinguishable, however, because here, C & G denied obtaining credit information on plaintiffs, and plaintiffs have failed to submit any evidence to support their claim that C & G violated the FCRA. In Bils, the defendants admitted obtaining a credit report. Further, plaintiffs have failed to show that C & G had any contact with the state unlike the defendants in Bils. Accordingly, the Court lacks personal jurisdiction over C & G.

B. Blahnik
Plaintiffs' only claim against Blahnik is that he violated the FCRA by hiring C & G to conduct background checks of plaintiffs in April and May of 1992. Plaintiffs contend that Blahnik had sufficient contacts with Missouri for the Court to exercise personal jurisdiction over him. The evidence plaintiffs have submitted in their supplemental response indicates that Blahnik was the manager of field operations for the PPC. His duties included setting up a staff to help the states' organizations get Perot on the ballot. Document 70, exh. 6 at 11-12. Blahnik hired regional managers to assist in the organizational efforts. Russ Monroe was the regional manager for the area that included Missouri. Id. at 16-17. Monroe worked with the field representatives in the region. Blahnik had weekly contact with Monroe. Id. at 18. Russ Melbye assisted Monroe in Missouri. Id. Blahnik interviewed Melbye for that job. Melbye stated that he hired C & G to conduct background checks on some of the electors to make certain that the electors were "good-standing citizens." Id. exh. 5 at 29. Melbye contacted C & G on Monroe's recommendation. Id. The list of electors given to C & G included plaintiffs. Id. Plaintiffs have also provided evidence indicating that Blahnik participated in a telephone call with Mulford on April 27, 1992, to Laughlin in Missouri. Blahnik advised Laughlin that the PPC would no longer recognize Laughlin as the state coordinator of Missouri for Perot. Id., exh. 1 at ¶ 4, exh. 2 at ¶¶ 6-7. Plaintiffs' evidence also reveals that Blahnik attended the presidential debate and Perot rally afterwards in St. Louis in October 1992. Id. at exh. 6, at 31, 54; exh. 7, 28-29.
The Court concludes that these contacts are insufficient to establish personal jurisdiction over Blahnik in Missouri. Blahnik had no contacts with Missouri in relation to the cause of action alleged against him. Moreover, there is no evidence to support the allegation that Blahnik hired C & G to conduct background checks on plaintiffs. Rather, Blahnik testified that he did not contact C & G regarding plaintiffs or any other volunteer in Missouri. Document 72, Blahnik depo. at 80-82. Blahnik did not request a consumer credit report on plaintiffs or information from a credit reporting agency. Id. *424 at 81. Rather, Melbye contacted C & G regarding the investigation of the Missouri for Perot volunteers. Id., Melbye depo. at 29-30. Blahnik's other sporadic contacts with Missouri are unrelated to the cause of action asserted against and thus provide no basis for jurisdiction under the long-arm statute.

C. Perot
Plaintiffs have asserted claims against Perot for violating the FCRA (Count I), invasion of privacy (Count VIII), defamation (Counts IX, X), and negligence (Count XII). Plaintiffs maintain that the Court may exercise personal jurisdiction over Perot because (1) Perot systematically and intentionally conducted, or caused to be conducted, activities in the state and (2) Perot, through his agents and employees, engaged in tortious conduct which damaged plaintiffs within the state.
In support of their claim that Perot systematically conducted or caused to be conducted activities in Missouri, plaintiffs note that in February 1992, Perot solicited volunteers in all 50 states to place him on the ballot and that Blahnik, an employee of Perot, became involved in the petition effort on March 10, 1992, by organizing a nationwide field staff to support the petition effort. Document 70, exh. 6 at 11, 16-17. Perot filed declarations of candidacy for President of the United States and filed them with the Missouri Secretary of State on July 20, 1992. Id. exh. 10. Also, plaintiffs note that Perot was present in St. Louis, Missouri, for a presidential debate and rally in October 1992.
Plaintiffs further assert that the Court may exercise personal jurisdiction over Perot because the actions giving rise to this cause of action were undertaken by Perot's agents in Missouri. Plaintiffs argue that McClure and Melbye were acting as Perot's agents at the May 19, 1992 meeting. Dyck and Laughlin have submitted affidavits stating that Melbye informed Laughlin three times during the course of that meeting that he was representing Ross Perot and that Perot supported the actions taken at the meeting. Id., exh. 1 at ¶ 3; exh. 2 at ¶ 7. Roger Yane, the statewide coordinator for the Perot petition drive in Ohio, provided an affidavit in support of plaintiffs' claims. Yane stated that Melbye and Monroe advised him that they were representing Perot with respect to the petition drive and that Monroe said he personally convinced Perot to repetition Missouri. Id., exh. 10 at ¶¶ 1-5.
The Court concludes that Perot's personal contacts with Missouri, as identified by plaintiffs, are insufficient to support jurisdiction. The evidence indicates that the contacts are unrelated to the causes of action asserted against him and do not arise from the specific transactions on which plaintiffs attempt to base jurisdiction. The Missouri long-arm statute requires such a connection. See Precision Constr. Co., 765 F.2d at 118-19. Moreover, Perot's presence in the state for a debate and rally occurred well after the events at issue herein transpired. Plaintiffs have identified no personal contact by Perot with Missouri during the relevant time. Thus, the only possible basis for personal jurisdiction over Perot is under plaintiffs' agency theory. With respect to Counts I and VIII, however, the agency theory is unavailing because plaintiffs have failed to submit any evidence to support their claim that Perot or his agents violated the FCRA.
Plaintiffs' agency theory also fails concerning the claims of defamation, false imprisonment and negligence because plaintiffs have failed to submit evidence to establish that Melbye and McClure were acting as Perot's agents at the time the actions giving rise to these claims took place. "The critical element which establishes the existence of an agency relationship is the right to control the conduct of the agent in the performance of the service for the principal." Lucas v. Enkvetchakul, 812 S.W.2d 256, 261 (Mo.Ct. App.1991). Plaintiffs have failed to submit evidence to establish the critical element of control by Perot of the acts of the alleged agents.
Melbye testified that he never reported to Perot while he worked for the PPC. Document 72, Melbye depo. at 70. Melbye also indicated that he did not discuss the activities of Missouri for Perot with Perot. Id. According to Melbye, Perot did not direct Melbye's day to day activities in Missouri. Id. at 71. Melbye testified that he did not personally *425 represent Perot at any time from April to December of 1992. Id. Melbye testified that Perot was not involved in the Missouri petition effort during that period. Id. at 73. Melbye further stated that he did not discuss the May 19, 1992 letter with Perot. Id. at 75.
Plaintiffs have submitted evidence indicating that Melbye and Monroe made statements to the effect that they were representing Perot during the May 19 meeting and thereafter. Document 70, exh. 1 at ¶ 3; exh. 2 at ¶ 7; exh. 11 at ¶¶ 4-5. Plaintiffs' reliance on these statements is misplaced, however. "[I]t is well established that apparent authority cannot be created by the acts of the supposed agent alone." Earl v. St. Louis Univ., 875 S.W.2d 234, 238 (Mo.Ct.App.1994).
Similarly, McClure's testimony reveals that during the time she served as state coordinator for Missouri for Perot, Perot had no involvement in the organization. Document 72, McClure depo. at 84. McClure was never employed by Perot, she never had authority to make any decision on his behalf, and she had not even spoken with Perot when she took over the position as state coordinator. Id. at 86-87. McClure testified that Perot did not manage or direct any activities of Missouri for Perot and that she did not report to Perot on the actions she took in connection with the petition drive. Id. at 87.
The testimony of McClure and Melbye is consistent with Perot's affidavit. Taken together, this evidence indicates that Perot was not personally involved in the transactions giving rise to the claims against him and that McClure and Melbye were not acting as his agents with respect to these claims. Plaintiffs' complaint against Perot is therefore dismissed for lack of jurisdiction.
NOTES
[1] A copy of the document is attached to each of the complaints.
[2] C & G and Perot and Blahnik moved to strike the Dyck affidavit because the affidavit (1) is not based on personal knowledge and (2) relies on hearsay. Documents 35, 37 at 3 n. 1.
[3] "A/U" is an abbreviation for address update. Document 54, exh. R-1. Literature from TRW indicates that it provides this service to subscribers to help update mailing lists. Id. at R-2.