**DAKOTA INDUSTRIES, INC., Appellant,**

v.

**DAKOTA SPORTSWEAR,
INC., Appellee.**

No. 90–5481.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1991.

Decided Oct. 16, 1991.

---

Donald N. Srstka, Sioux Falls, S.D., for appellant.

Scott A. Hindman, Sioux City, Iowa, argued (F. Joseph Du Bray and Scott A. Hindman, on the brief), for appellee.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

**1386**

JOHN R. GIBSON, Circuit Judge.

Dakota Industries, Inc., appeals from the district court's dismissal of its trademark infringement claim against Dakota Sportswear, Inc., for lack of personal jurisdiction and venue. On appeal, Dakota Industries argues that the court can exercise jurisdiction under the tort accrual provision of the South Dakota long-arm statute, that Sportswear's contacts with South Dakota are sufficient to satisfy due process requirements, and that venue is proper because Dakota Sportswear can be deemed to "reside" in South Dakota under 28 U.S.C. § 1391(c) (1988). We reverse the order of the district court.

Dakota Industries, a South Dakota corporation based in Tea, South Dakota, manufactures women's clothing, including jumpsuits, shorts, shirts, pants, and outerwear. Dakota Sportswear, a California corporation based in North Hollywood, California, primarily manufactures warm weather clothing for large-size women but also produces a smaller line for petite women.

Since 1972, Dakota Industries has been the registered holder of the trademark "Dakota" for snowmobile suits, jackets, coats, coveralls, ski pants and jackets, jumpsuits, and jackets. The trademark has been approved as incontestable under federal law. The United States Patent Office, according to an uncontroverted sworn statement by Industries' president, has rejected at least twice Sportswear's application to register the "Dakota" trademark.

In January 1989, one of Dakota Sportswear's suppliers mistakenly sent a $475 invoice for bias binding to Dakota Industries. When Industries investigated the mix-up, it discovered that the order had been placed by Dakota Sportswear. Later that month, Dakota Industries' president, Donald Mackintosh, placed a call to Sportswear at its California office and spoke with its president, Kerry Jolna. After Mackintosh explained who he was, Jolna said that he had been expecting the phone call and that his attorney had told him Mackintosh would be calling.

In April 1989, one of Dakota Industries' attorneys sent by certified mail a "cease and desist" letter to Dakota Sportswear, demanding that Sportswear immediately discontinue manufacturing, advertising, and selling goods with the "Dakota" trademark.

Four months later, in August, Mackintosh purchased a size 11 pair of women's pants bearing Dakota Sportswear's label, "DAKOTA SPORT," at the ½ Price Store in Sioux Falls, South Dakota. In October 1989, three months before Industries filed this lawsuit, lawyers in an unrelated case deposed Dakota Sportswear's executive vice president, Steven W. Jolna. In his deposition, Jolna stated that: (1) the end purchasers of Sportswear's large-size and "missy" pants are located throughout the entire United States; (2) Dakota Sportswear sold its "Dakota Sport" clothes on a "national basis"; (3) he was "sure" that Sportswear sold to major chains with outlets in South Dakota but that Sportswear markets its clothes "mostly in New York and California" and does not market in South Dakota; and (4) if the chains to which Sportswear sells have outlets in South Dakota, Sportswear's clothes may be shipped there but that he could not recall having sent a shipment to South Dakota. Jolna identified several major retail chains to which Sportswear sells or has sold its products, including Women's World, Monica Scott, Richman Gordman, and the ½ Price Stores. He described the locations of the Monica Scott stores as being "mostly northwest, midwest and northern California."

After Dakota Industries filed this trademark infringement action in January 1990, Mackintosh discovered that Dakota Sportswear garments were available in five more stores in Sioux Falls in addition to the ½ Price Store where he had earlier purchased the size 11 pants. One of these stores carried jackets bearing the "DAKOTA SPORT" label. Mackintosh later filed a supplemental affidavit in which he stated that Dakota Sportswear was "drop" shipping its garments directly into South Dakota. Mackintosh rested his assertion on an exchange in Jolna's deposition. When

asked "Does Dakota Sportswear sell to any retailers in the State of South Dakota?", Jolna replied: "I am—I'm sure that there are some of the major chains who may have outlets there. We do not market in South Dakota. We market mostly in New York and California. If they happen to have stores that are located there, *they may be shipped there ....*" (Emphasis in affidavit). Mackintosh did not include in his affidavit the rest of Jolna's statement, which was: "... but I cannot say that I recall having sent a shipment there."

During the deposition, Jolna had been asked whether his company directly shipped garments to the chains' branch stores. His attorneys objected, and he did not answer the question.

In May 1990, Steven Jolna filed an affidavit in this lawsuit stating that Dakota Sportswear has no offices, outlets, agents or employees in South Dakota, that it has never marketed or advertised in South Dakota, and that it has never directly or indirectly shipped its products into South Dakota. If the retail chains to which Dakota Sportswear sells its clothes ship those clothes to South Dakota, that action is something that Dakota Sportswear "cannot predict or control," Jolna stated.

In June 1990, Dakota Industries sought discovery of the interstate common-carrier numbers assigned to Dakota Sportswear's shipments. Industries' stated purpose was to ascertain whether Dakota Sportswear was in fact shipping its garments into South Dakota. Dakota Sportswear refused and filed a motion for a protective order and to quash discovery on the ground that information sought exceeded the jurisdictional issue before the court.

The district court did not rule on the motion for a protective order, but instead granted Sportswear's motion to dismiss for lack of personal jurisdiction and venue. *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 742 F.Supp. 548, 552 (D.S.D.1990). The district court held that Dakota Sportswear lacked the necessary minimum contacts with South Dakota to support personal jurisdiction and thus could not be deemed to reside there for venue purposes. *Id.* It further held that venue was improper under 28 U.S.C. § 1391 because the claim did not arise in South Dakota. *Id.* at 550. This appeal followed.

## I.

Dakota Sportswear asserts that Dakota Industries has the burden of proving personal jurisdiction. It cites *Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651 (8th Cir.1982), for the proposition that the party seeking to invoke the court's jurisdiction bears the burden of proof on that issue and that " 'the burden may not be shifted to the party challenging the jurisdiction.' " *Id.* at 653 n. 3 (quoting *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 490 (5th Cir.1974)).

■ While it is true that the plaintiff bears the ultimate burden of proof on this issue, jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing. *Cutco Ind. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986). To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction. *Watlow Elec. Mfg. v. Patch Rubber Co.*, 838 F.2d 999, 1000 (8th Cir.1988); *Falkirk Min. Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 373 (8th Cir.1990). If the district court does not hold a hearing and instead relies on pleadings and affidavits, as it did here, the court must look at the facts in the light most favorable to the nonmoving party, *Watlow Elec. Mfg.*, 838 F.2d at 1000, and resolve all factual conflicts in favor of that party. *Nieman v. Rudolf Wolff & Co., Ltd.*, 619 F.2d 1189, 1190 (7th Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980). On appeal, we examine de novo the question of whether the nonmoving party has established a prima facie case of personal jurisdiction. *Cutco Indus.*, 806 F.2d at 365.

## A.

We approach our analysis of personal jurisdiction on two levels, first examining

whether the exercise of jurisdiction is proper under the forum state's long-arm statute. *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223, 225 (8th Cir.1987). If the activities of the non-resident defendant satisfy the statute's requirements, we then address whether the exercise of personal jurisdiction comports with due process. *Id.; see also Watlow,* 838 F.2d at 1001.

■ Dakota Industries asserts that the court's jurisdiction is proper under the tort accrual provision of the South Dakota long-arm statute. That provision confers jurisdiction over any person involved in "[t]he commission of any act which results in accrual within this state of a tort action." S.D.Codified Laws Ann. § 15–7–2(2) (1984 & Supp.1991).

■ Infringement of a trademark is a tort, *Union National Bank v. Union National Bank,* 909 F.2d 839, 843 n. 10 (5th Cir.1990); *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 218 (1st Cir.1989), and requires the use, without the owner's consent, of the same or a similar mark in connection with the sale of goods that is likely to cause confusion. *Keds Corp.,* 888 F.2d at 218; *Co–Rect Prod., Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1329–30 (8th Cir.1985).[1]

Dakota Sportswear argues that section 15–7–2 does not apply because it has performed no acts that would fall under any section of the long-arm statute. Specifically, it asserts that it has no offices, agents or property in South Dakota and has not conducted any business or shipped any items of clothing into South Dakota. The South Dakota Supreme Court has suggested, however, that the exercise of jurisdiction over a non-resident tortfeasor is permissible under section 15–7–2(2) if the injury itself occurs in the state even though the chain of events leading to the injury occurs outside the state. *Russell v. Balcom Chemicals, Inc.,* 328 N.W.2d 476, 478–79 (S.D.1983). Moreover, the plain language of the statute does not require the

"commission of [the] act" to be within the state; jurisdiction is permissible as long as the act committed "results in *accrual within this state* of a tort action." S.D.Codified Laws Ann. § 15–7–2(2) (emphasis added). The South Dakota Supreme Court has interpreted the state's long-arm statute as conferring jurisdiction to the fullest extent permitted by constitutional due process considerations. *Ventling v. Kraft,* 83 S.D. 465, 161 N.W.2d 29, 34 (1968).

In trademark infringement actions, two circuits have stated that the claim arises at the place of the "passing off," which is "where the deceived customer buys the defendant's product in the belief that he is buying the plaintiff's." *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 639 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). *See also Tefal, S.A. v. Products Int'l Co.,* 529 F.2d 495, 496 n. 1 (3d Cir.1976) ("It is undisputed that a cause of action for trademark infringement arises where the passing off occurs"); *Schieffelin & Co. v. Jack Co.,* 725 F.Supp. 1314, 1319 (S.D.N.Y.1989) (trademark infringement claim arises where the deceived customer buys the defendant's product) (citing *Vanity Fair,* 234 F.2d at 639). Other courts, however, have identified the site of injury as being the place where the plaintiff suffers the economic impact. *Acrison, Inc. v. Control & Metering, Ltd.,* 730 F.Supp. 1445, 1448 (N.D.Ill.1990). The *Acrison* court stated: "Damage to intellectual property rights (infringement of a patent, trademark or copyright) by definition takes place where the *owner* suffers the damage." *Id.* (emphasis in original). *Cf. Horne v. Adolph Coors Co.,* 684 F.2d 255, 259 (3d Cir.1982) (in patent infringement case, patent is deemed to have *its* fictional situs at the residence of the owner).

We need not decide this issue because in this case some of Sportswear's garments were "pass[ed] off" in the forum state, and Dakota Industries has its principal place of

---

1. Dakota Industries asserts claims under two sections of the Lanham Act, 15 U.S.C. § 1114 (1988) and 15 U.S.C. § 1125(a) (1988). Section 1114 prohibits the infringement of a registered

mark, while section 1125(a) does not require a registered mark and simply prohibits false designations of origin. *See Co–Rect Products,* 780 F.2d at 1329 & nn. 6, 7.

business in the forum state and thus suffered the economic injury there.

We next address whether Dakota Industries' pleadings, affidavits, and exhibits supply the necessary prima facie showing of a tort. *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir.1974). Affidavits and exhibits presented by Dakota Industries state that Industries holds the registered trademark "Dakota" for "snowmobile suits, jackets, coats, coveralls, ski pants and jackets, jumpsuits and jackets"; that Dakota Sportswear's garments are sold in South Dakota and that Industries' president, Mackintosh, purchased such a garment in Sioux Falls; that Sportswear's use of the "Dakota" trademark is without Industries' consent; and that Industries and Sportswear manufacture similar types of garments, making the possibility of customer confusion likely.

Looking at the facts in the light most favorable to Dakota Industries, as we must under *Watlow*, we conclude that Industries has made an adequate prima facie showing that its registered mark was used in connection with the sale of goods without its consent and that its use was "likely to cause confusion." *See Keds Corp.*, 888 F.2d at 218. Thus, Dakota Industries' claim of trademark infringement falls within the ambit of section 15–7–2(2).

### B.

■ South Dakota's long-arm statute permits the assertion of jurisdiction to the fullest extent allowed by the fourteenth amendment's due process clause. *Ventling*, 161 N.W.2d at 34; *Austad*, 823 F.2d at 225. Thus, constitutional limits will determine whether jurisdiction over Dakota Sportswear is proper.[2]

2. Because this is a federal question case and a federally created right is at issue, we examine due process in light of the fifth amendment rather than the fourteenth amendment. *See Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1143 (7th Cir.1975). Although the Supreme Court has defined the "minimum contacts" standard in the context of diversity jurisdiction, *id.*, and it is clear that Congress can authorize nationwide service of process in federal question cases without offending due pro-

In a series of cases following *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court has elucidated the "minimum contacts" standard that must be satisfied before a nonresident can be subjected to the jurisdiction of a state's courts. *See, e.g., Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Due process requires that out-of-state defendants have " 'fair warning' " that they could be "haled into" court in a foreign jurisdiction, *Burger King*, 471 U.S. at 472, 474, 105 S.Ct. at 2182, 2183. This requirement "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum.... and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182 (citations omitted).

The contacts with the forum state must be more than " 'random,' " " 'fortuitous,' " or " 'attenuated.' " *Id.* at 475, 105 S.Ct. at 2183 (citations omitted). The due process clause forecloses personal jurisdiction unless the actions of the "defendant *himself* ... create[d] a 'substantial connection' with the forum State." *Id.* (citations omitted). *See also Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987) (action of defendant must be purposefully directed toward forum state). Once the court has found that the defendant purposefully established the requisite minimum contacts with the forum state, the court still must determine whether the assertion of jurisdiction comports with " 'fair play and substantial justice.' " *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *Interna-*

cess, *Johnson Creative Arts v. Wool Masters, Inc.*, 743 F.2d 947, 950 (1st Cir.1984), we nonetheless apply the minimum contacts analysis here. The fifth amendment is "essentially a recognition of the principles of justice and fundamental fairness," *Honeywell*, 509 F.2d at 1143, so it is appropriate that we examine the contacts with the forum state. *See id.* (citing federal question cases in which the court applied a minimum contacts analysis).

*tional Shoe,* 326 U.S. at 320, 66 S.Ct. at 160).

■ In *Land–O–Nod Co. v. Bassett Furniture Industries,* 708 F.2d 1338 (8th Cir. 1983), we reiterated our test for evaluating the propriety of jurisdiction under the due proces clause. We consider: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Id.* at 1340. Of these factors, the first three are the most important. *Id.*

Dakota Sportswear asserts that it has no contacts with South Dakota, that it did not use agents or subsidiaries to establish contacts there, and that the marketing of its products in that state resulted solely from the unilateral actions of others. Citing *Asahi,* in which the Supreme Court stated that a defendant's launching of a product into the stream of commerce with the awareness that the stream "may or will sweep the product into the forum State" was insufficient to confer jurisdiction, 480 U.S. at 112, 107 S.Ct. at 1032, Sportswear argues that the ultimate sales of its product in South Dakota do not supply the requisite contacts.

Dakota Industries asserts, however, that jurisdiction is proper because Sportswear reasonably anticipated the sales in South Dakota when it launched its products into the stream of commerce. Industries further argues that the merchandising of Sportswear's clothes was not a mere isolated act and that the cause of action flows from Sportswear's ongoing commercial ties with South Dakota.

The district court rejected Industries' arguments, stating that no cases "adopt the view that *any* sale of goods bearing an infringing trademark, either directly or indirectly, constitutes sufficient minimum contacts...." 742 F.Supp. at 551. The district court concluded that the contacts in this case were less significant than those in *Austad,* where we held that a New York law firm which had sent employees to South Dakota to review documents, made numerous phone calls to South Dakota, used courier services between the two states, and sent bills to and received checks from South Dakota, lacked adequate contacts with South Dakota to permit the constitutional exercise of jurisdiction. *Austad,* 823 F.2d at 226–27.

■ We agree that *Austad* and *Asahi* do not strongly support the assertion of personal jurisdiction over Dakota Sportswear. These cases do not provide a complete answer to the issues before us, however. In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Supreme Court made a sharp distinction between "mere untargeted negligence" and "intentional, and allegedly tortious, actions" aimed expressly at the forum state. *Id.* at 789, 104 S.Ct. at 1487. Although the defendant's lack of control over distribution of the product in the forum state may weigh against jurisdiction in a negligence action, that lack of control will not bar jurisdiction when the plaintiff has alleged an intentional tort. *Id.* at 789–90, 104 S.Ct. at 1487.

In *Calder,* the Court upheld the assertion of jurisdiction over an editor and reporter of the *National Enquirer,* a Florida-based weekly newspaper with a nationwide circulation. The plaintiff, an entertainer who resided in California, sued them for libel based on an article they produced. *Id.* at 784–85, 104 S.Ct. at 1484. The Court concluded that California could assert personal jurisdiction over the nonresident defendants despite their lack of control over the marketing of the publication in California, because their intentional actions were aimed at the forum state, they knew that the article "would have a potentially devastating impact" on the plaintiff and they knew that the brunt of injury would be suffered in the state where the plaintiff lived and where the newspaper had its largest circulation. *Id.* at 789–90, 104 S.Ct. at 1486–87. Under these circumstances, "petitioners must 'reasonably anticipate being haled into court there'...." *Id.* at 790, 104 S.Ct. at 1487.

The Supreme Court thus approved an "effects" test that allows the assertion of

personal jurisdiction over non-resident defendants whose acts "are performed for the very purpose of having their consequences felt in the forum state." *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir.1989). *See also Haisten v. Grass Valley Medical Reimbursement*, 784 F.2d 1392, 1397 (9th Cir. 1986) (jurisdiction may be proper when defendant's only contact with the forum state is the " 'purposeful direction' " of a foreign act having effect in that state); *Hugel v. McNell*, 886 F.2d 1, 5 (1st Cir.1989) (requirement of purposeful contact or substantial connection satisfied when intentional tortfeasor knew that major impact of the injury would be felt in the forum state).

We recognize that some distinctions exist between the facts presented in this case and those in *Calder*. The allegedly wrongful act in *Calder* was perhaps more directly aimed at the plaintiff and her work in the forum state than may be true in this case. Moreover, the *National Enquirer*, which has its biggest circulation in California, 465 U.S. at 790, 104 S.Ct. at 1487, may have a stronger sales presence in the forum state than Dakota Sportswear does. These distinctions do not prevent the applicability of *Calder* to the facts of this case, however.

We believe that this case falls somewhere between *Asahi* and *Austad* on one hand and *Calder* on the other, but, in our view, it is somewhat closer to *Calder*. Like *Calder*, this case involves intentional tortious wrongdoing—namely, the use of the trademark with knowledge of the infringement.

In his affidavit, Industries' president Mackintosh stated that he had information that Dakota Sportswear had twice been rejected in its attempts to register the trademark "Dakota." Sportswear did not challenge this sworn statement. Mackintosh further stated that Kerry Jolna admitted "expect[ing]" his phone call when Mackintosh contacted Sportswear's headquarters in January 1989. Dakota Industries also produced evidence that it sent a "cease and desist" letter to Sportswear in April 1989. All of this evidence supports Industries' contention that Sportswear knowingly and intentionally infringed on the trademark.

Moreover, in his deposition, Steven Jolna testified that he was "sure" that Dakota Sportswear sold to chains with retail outlets in South Dakota. The fact that some of the "passing off" occurred in South Dakota, along with the fact that Industries' principal place of business is in South Dakota, demonstrates that Sportswear's actions were uniquely aimed at the forum state and that the "brunt" of the injury would be felt there, as required by *Calder*. Under these circumstances, Sportswear "must 'reasonably anticipate being haled into court' " in South Dakota. *See Calder*, 465 U.S. at 790, 104 S.Ct. at 1487.

Our holding is further bolstered by the fact that there is at least some suggestion in the record that Sportswear directly shipped to South Dakota. Although Steven Jolna denied in an affidavit that Sportswear directly shipped to South Dakota, his earlier statement in the deposition that Sportswear's garments "may be shipped there" lends some support to Industries' assertion that Sportswear has made direct shipments to South Dakota.

Industries attempted through discovery to get further information on whether Sportswear shipped to South Dakota, but the district court granted the dismissal before settling the discovery dispute.

In ruling on the propriety of a dismissal under Fed.R.Civ.P. 12(b)(2) when the district court has held no hearing, we must consider the facts in the light most favorable to the nonmoving party. So considered, we conclude that Dakota Industries has met its burden of making a prima facie showing.

In relying on *Calder*, we do not abandon the five-part test of *Land O'Nod*. We simply note that *Calder* requires the consideration of additional factors when an intentional tort is alleged. *See Haisten*, 784 F.2d at 1397. We thus reverse the district court's holding on jurisdiction and remand for further proceedings consistent with the procedures discussed in *Watlow*, 838 F.2d at 1000, and *Cutco Industries*, 806 F.2d at 365.

## II.

Dakota Industries argues that the district court also erred in concluding that South Dakota was not the proper venue for this action. Under the 1988 amendment to 28 U.S.C. § 1391(c), a defendant is "deemed to reside [for venue purposes] in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." The Federal Circuit recently held that the amended statute is to be accorded its plain meaning. *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1580 (Fed.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991).

Dakota Industries made a prima facie showing of personal jurisdiction. If personal jurisdiction exists at the commencement of the action, then venue is proper under 28 U.S.C. § 1391(b) (1988) [3]. We thus conclude that the district court erred in dismissing this action for improper venue.

For the foregoing reasons, we reverse the order of the district court.

---

**3.** The current version of this statute is found at    28 U.S.C.A. § 1391(b) (West Supp.1991).