**TORCHMARK CORPORATION and Stephens Inc., Plaintiffs,**

v.

**C. Fred RICE, Robert T. Shaw, Consolidated National Corporation, Consolidated Fidelity Life Insurance Company, Robert Beisenherz, and Lewis & Ellis, Inc., Defendants.**

No. LR–C–95–525.

United States District Court, E.D. Arkansas, Western Division.

May 8, 1996.

Kevin A. Crass, Little Rock, AR, Eric R. Cromartie and R. Matthew Molash, Dallas, TX, for plaintiffs.

Peter G. Kumpke, Little Rock, AR, Charles W. Cunningham, Dallas, TX, Phil W. Campbell, North Little Rock, AR, Ernest E. Figari, Jr., Don Colleluori and Michael G. Brown, Dallas, TX, William B. Putman IV, Fayetteville, AR, Jay J. Madrid, Greg A. Sivinski, Donald F. Campbell, Dallas, TX, David A. Pearl Street, Dallas, TX, for defendants.

## ORDER

ROY, District Judge.

Now before the Court is the motion of the defendants to either dismiss this case or alternatively, transfer it to the Northern District of Texas. They argue some of them are not subject to personal jurisdiction in Arkansas, that venue is improper in this district, and that the Northern District of Texas is a

more convenient forum.[1] For the reasons set out below, the motion is denied.

Our litigants are as follows: plaintiff Torchmark Corporation is a Delaware corporation with its principal place of business in Birmingham, Alabama. Plaintiff Stephens, Inc. is an Arkansas corporation with its principal place of business here in Little Rock. By their own admissions, defendants C. Fred Rice and Robert T. Shaw are both citizens of Florida. Defendant Robert Beisenherz is a citizen of Colorado.

Finally, defendant Lewis & Ellis, Inc. is a Texas corporation with its principal place of business in Dallas. Consolidated National Corporation ("CNC") is a Florida corporation with its principal place of business in Louisville, Kentucky. Consolidated Fidelity Life Insurance Company ("CFLIC") was a subsidiary of CNC which has since been "merged into" the parent company.

Essentially, Stephens and Torchmark complain that stock which they purchased in February of 1994 in an insurance holding company named "ICH," from some of the defendants, was materially and fraudulently misrepresented to them by the defendants. This resulted in losses to Stephens and Torchmark in excess of $20 million.

The predecessor of ICH was a corporation formed by defendant Robert Shaw in the 1960's. This publicly traded Kentucky corporation was organized for the purpose of buying up small life insurance companies. It grew over time and was eventually renamed ICH.

Later, as part of a restructuring effort, Shaw formed Consolidated National Corporation. Shaw owned about 56% of CNC's stock and served as president of the company. Fred Rice owned approximately 35% of the company and served as secretary-treasurer. The remaining 9% of the shares were owned by a Mr. Edward Carlisle who is not a party to this action.[2]

In late 1993, CNC owned all of ICH's Class B common stock and 22% of ICH's Class A common stock. Shaw (from time to time) and Rice (continuously from 1975 to 1995) had served on ICH's board of directors.

ICH had a large amount of bond debt coming due in 1995 and 1996, but did not have the cash flow to retire (pay off) those bonds upon their due date. Its two best options were to either somehow obtain an infusion of capital or to refinance its debt, or perhaps some combination of the two. In late 1993, Shaw and Robert Beisenherz, who was the CEO of ICH at that time, contacted Stephens, Inc. in Little Rock, a company with whom ICH had had a business relationship for 10–15 years, about ICH working itself out of its financial bind.

After meetings in Little Rock on December 8, 1993, and on December 21, 1993, between Shaw, Beisenherz, and Stephens officials, and after additional long distance communications of various types, an agreement was eventually reached wherein Stephens, Inc. and Torchmark would *each* purchase from CNC enough ICH Class A stock to give each of them 9.9% of ICH's Class A stock.[3] This would result in CNC being left with less than 2% of ICH's Class A stock. CNC's then-time subsidiary, CFLIC, held a handful of shares in its name which were not part of the stock purchase deal; all of the ICH stock bought by Stephens and Torchmark came from CNC.

Rice did not travel to Little Rock until the bargain was struck, but was in regular contact with Shaw and Beisenherz about the negotiations at every step. The total proceeds to CNC of the sale of its ICH stock at $5 per share amount to between $40 and $45 million. Much of the cash the sale generated

---

1. Defendant Consolidated National Corporation does not contest this Court's jurisdiction over it, but joins the other movants in seeking a transfer to Texas. Separate defendant Consolidated Fidelity Life Insurance Company has neither made nor joined any of the other motions.

2. Sometime after the February 11, 1994, sale of ICH stock from CNC to Stephens and Torch-

mark, Mr. Carlisle's shares were retired by CNC, leaving Shaw and Rice as CNC's only two shareholders.

3. Apparently, neither Stephens nor Torchmark wished to own 10% of ICH's stock—to do so would make one a "controlling party" under certain securities laws.

went to pay off CNC debt. Some was paid out in the form of dividends to the three CNC shareholders: Shaw, Rice, and Carlisle. An additional part of the stock purchase deal was the agreement that once Stephens and Torchmark controlled their 19.8% of ICH, they would see to it that Shaw and Rice would each get consultation fees from ICH annually.

Less than two years after the stock purchase deal was completed, ICH was in bankruptcy and its common stock was trading at about 75 cents per share.

The plaintiffs contend that several material facts having to do with ICH's financial condition were misrepresented to them by all of the defendants. After Stephens and Torchmark filed this action in Little Rock in August of 1995, Mr. Shaw and CNC immediately filed suit against Stephens, Torchmark, and others in federal district court in Dallas. These motions to dismiss for lack of jurisdiction or improper venue or, alternatively, to transfer, followed.

## I. Personal Jurisdiction

### A. Generally

■ Since none of the defendants in this diversity action is a resident of Arkansas, personal jurisdiction must be conferred by the Arkansas "long-arm" statute. Ark.Code Ann. § 16–4–101 *et seq.*[4] The long-arm statute has been recently amended to eliminate confusion over its application, as well as possible constitutional infirmities. The current version, enacted only last year, reads in pertinent part as follows:

B. PERSONAL JURISDICTION. The courts of this state shall have personal jurisdiction of all persons, and all causes of action or claims for relief, *to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution.*

Ark.Code Ann. § 16–4–101(B) (emphasis added).

■ To satisfy the due process requirements of the Constitution, a two-prong test

must be satisfied. First, a court is required to examine the defendant's activity in the forum to determine if it has had "minimum contacts" with the forum state. If so, the court then determines whether the exercise of jurisdiction is consistent with "traditional notions of fair play and substantial justice." *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). To establish the necessary "minimum contacts" to allow an exercise of personal jurisdiction, a court must consider whether a non-resident defendant "purposely established 'minimum contacts' in the forum state." *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). A critical consideration is whether, by some act or acts, the defendant has purposely availed himself of the privilege of conducting activities within the forum state, *id.*, or has "purposefully directed" his activities at the forum state. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984).

In determining whether a defendant has established the minimum contacts requirement, the Eighth Circuit Court of Appeals has stated that one must consider:

(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience or inconvenience to the parties. [citation omitted] Of these factors, the first three are the most important.

*Dakota Industries v. Dakota Sportswear*, 946 F.2d 1384, 1390 (8th Cir.1991); *Thompson v. Ecological Science Corp.*, 421 F.2d 467, 469 (8th Cir.1970).

■ Only a *prima facie* showing of jurisdiction need be made by a plaintiff to resist dismissal for a purported lack of personal jurisdiction. *Barone v. Rich Bros. Interstate Display Fireworks*, 25 F.3d 610, 612 (8th Cir.1994).

*See Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.*, 519 F.2d 634, 637 (8th Cir.1975).

---

4. Personal jurisdiction over a non-resident defendant in a diversity action is determined by the law of the forum in which the federal court sits.

## B. Defendants Shaw and Rice

Both defendants Shaw and Rice argue that their contacts with the state of Arkansas were neither of the type nor frequency for the long-arm statute to be properly applied to them. They also argue that the "fiduciary shield" doctrine is alive and well in Arkansas and puts them beyond the reach of the long-arm statute. For reasons discussed below, the Court regards these arguments to be two sides of the same coin.

No one has questioned that CNC in its corporate capacity has met the minimum contacts requirements to come within this Court's jurisdiction. It sought out Stephens here in Little Rock, and according to the plaintiffs, for the purpose of intentionally committing fraud. Indeed, as stated above, CNC did not join in the portion of the pending motions objecting to jurisdiction. What *is* disputed is whether those contacts can be attributed to the people behind CNC—its officers and owners.

One of the defenses thrown up by the defendants is the fiduciary shield doctrine. The fiduciary (or "corporate") shield doctrine provides that individuals performing acts in a state in their corporate capacity are not subject to the personal jurisdiction of the courts of that state for those acts. A recognized exception provides that "if the corporate officer engages in tortious conduct in [his] corporate capacity in the forum, courts will consider this conduct as contact with the forum sufficient to support a finding of personal jurisdiction over the officer in [his] individual capacity." *Ripplemeyer v. National Grape Co-op. Ass'n, Inc.*, 807 F.Supp. 1439, 1446 (W.D.Ark.1992).

The parties purport to be in sharp disagreement as to exactly what Judge Waters' holding in *Ripplemeyer* means. The plaintiffs regard it as a pronouncement that the doctrine no longer exists in Arkansas. The defendants argue that, on the contrary, Judge Waters set out guidelines for how it should be applied. The Court believes that both sides are a little bit right and mostly wrong.[5] Then again, perhaps the positions can be reconciled as being a dispute over semantics.

In any event, it is this Court's opinion that whether the "fiduciary shield doctrine" (or the "corporate shield doctrine," or a rose by any other name) ever was a part of Arkansas law, either before or after *Ripplemeyer*, has been rendered moot by the General Assembly's adoption of the recent amendment of the long-arm statute (Acts of Arkansas 1995, No. 486), which broadened its reach to the full extent permitted by federal law, *i.e.*, the Fourteenth Amendment. In other words, to the extent that the fiduciary shield doctrine may have been a *state* imposed limitation on the Arkansas long-arm statute, that limitation, along with all others, has been removed by the legislature.

Furthermore, this Court holds that there is no separate fiduciary shield doctrine that exists apart from normal, current fourteenth amendment analysis. The defendants argue to the contrary and offer such authority as *Arkansas Rice Growers v. Alchemy Industries*, 797 F.2d 565 (8th Cir.1986).

Though the Eighth Circuit does not refer *per se* to a corporate or fiduciary shield doctrine, it includes its essence in this statement:

> The law is clear that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity.

*Alchemy*, 797 F.2d at 574. The defendants read that as an endorsement of their view. This Court disagrees.

To read this portion of *Alchemy* as holding that a corporate officer or agent is *automatically* beyond a court's jurisdiction because of his official status would be to suggest that the Eighth Circuit was unmindful of the Supreme Court's holdings on a similar issue in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473,

---

**5.** For what it's worth, *See Buffalo v. Springfield*, 372 F.2d 1121 (1967) (Stills, J.) ("Nobody's right, if everybody's wrong.")

79 L.Ed.2d 790 (1984) (decided the same day).

> [The petitioners'] status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum state must be assessed individually. [Citations omitted.] In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.

*Calder v. Jones,* 465 U.S. at 790, 104 S.Ct. at 1487.

In discussing whether either *Hustler Magazine*'s publisher/owner or its holding company were exempt from jurisdiction, the Supreme Court stated:

> It does not of course follow from the fact that jurisdiction may be asserted over Hustler Magazine, Inc., that jurisdiction may also be asserted over either of the other defendants. In *Calder v. Jones* at 790, 104 S.Ct. at 1487, we today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him.... Each defendant's contacts with the forum State must be assessed individually. (Cites omitted.)

*Keeton v. Hustler,* 465 U.S. at 781 n. 13, 104 S.Ct. at 1482 n. 13.

Of course *Calder* and *Hustler* were cases involving employees rather than individuals acting in a corporate capacity. However, the Court regards that distinction to be more one of degree rather than type—the reasoning should hold true in either event. That would be especially true in a situation where, as here, the corporate principals essentially *were* the company. As noted above, between them Shaw and Rice owned 91% of CNC's stock. In this Court's view, the argument for exercising jurisdiction over a principal is *stronger* than for exercising jurisdiction over a "mere employee."

However, even if the Court in *Alchemy* was distinguishing a corporate officer scenario from the company employee holdings in *Calder* and *Hustler* (without bothering to cite either of those cases) the *Alchemy* case is still distinguishable from the case at bar.

■ When a corporation is the alter ego of an individual, then jurisdiction over that individual can be predicated upon jurisdiction over the corporation. "In these cases, courts attribute a corporation's contacts with the forum state to an individual defendant for jurisdictional purposes. *See, e.g., Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.,* 519 F.2d 634 (8th Cir.1975)." *Stuart v. Spademan,* 772 F.2d 1185 (5th Cir.1985). "[I]f the corporation is [the individual's] alter ego, its contacts are his and due process is satisfied." *Lakota,* 519 F.2d at 637.

■ The better weight of authority holds that the test for "piercing the corporate veil" for the purpose of exercising personal jurisdiction over an individual is less stringent than when done to hold that individual liable for the acts of the corporation.

> It should be noted that the alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability. *See, e.g., Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981). "Accordingly, for jurisdiction to exist, there need not be both the existence of a mere shell corporation and fraud. Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction." 3A C. Swearingen, § 1296.1, at 81.

*Stuart v. Spademan,* 772 F.2d at 1198 n. 12.

■ This Court finds that, after giving the non-moving parties' allegations the deference they are due, there is "an unmistakable identity of interest between the defendant[s] [Shaw and Rice] and the corporation through which [they] act[ ]." *Spademan,* 772 F.2d at 1198, quoting *Holfield v. Power Chemical Co.,* 382 F.Supp. 388, 394 (D.Md.1974). CNC has indisputably acted in a manner that brings it within the long-arm statute. The Court finds that there exists an identity of interest between Shaw and Rice and the company they almost entirely owned. Therefore, attributing the contacts of CNC with the forum to defendants Shaw and Rice

for the purpose of asserting this Court's personal jurisdiction over them does not offend the due process requirements of the Constitution. Accordingly, doing so is permitted by the Arkansas long-arm statute.

■ Furthermore, and alternatively, the Court's jurisdiction should be extended to cover Shaw and Rice because the "plaintiffs have asserted various tort causes of action against the individual defendants," *Ripplemeyer*, 807 F.Supp. at 1446, namely negligent misrepresentation as well as fraud. Again, this is a well recognized exception to fiduciary/corporate liability rules.

> "[A] corporate agent may be held personally liable for torts committed in the corporate capacity. Accordingly, if the corporate officer engages in tortious conduct in his/her corporate capacity in the forum, courts will consider this conduct as contact with the forum sufficient to support a finding of personal jurisdiction over the officer in his/her individual capacity."

*Ripplemeyer*, 807 F.Supp. at 1446, quoting *National Precast Crypt Co. v. Dy–Core of Pa., Inc.*, 785 F.Supp. 1186, 1191 (W.D.Pa. 1992).

Defendant Rice argues, *inter alia*, because he had no significant contacts with Arkansas until *after* the deal closed, he is beyond the Court's jurisdiction. However, the Court would point out that the editor of the Florida tabloid in *Calder v. Jones* was held subject to California jurisdiction despite having only been to California *twice* in his life—"once, on a pleasure trip, prior to the publication of the article and once after to testify in an unrelated trial." *Id.*, 465 U.S. at 787, 104 S.Ct. at 1485. Jurisdiction over him was found "proper in California based on the 'effects' of [his] Florida conduct in California." *Id.*, at 790, 104 S.Ct. at 1487. Similarly, the effects of Mr. Rice's allegedly tortious conduct were felt in Arkansas.

### C. Defendant Robert Beisenherz

■ Mr. Beisenherz worked for defendant Lewis & Ellis, Inc. as a "consulting actuary" from the mid 1970's until June of 1990, and now works for them again. From June 1, 1990, until October 10, 1994, he served as Chairman of the Board, CEO, and President of ICH, the firm whose stock was purchased by the plaintiffs from CNC.

Like Mr. Shaw, Mr. Beisenherz traveled to Little Rock on more than one occasion for the purpose of negotiating with Stephens, Inc. regarding Stephen's purchase of ICH stock from CNC. During the pendency of those negotiations, Mr. Beisenherz also contacted people in Arkansas via various long-distance devices. In fact, it appears that Mr. Beisenherz probably made contact with Stephens sooner and more often than Mr. Shaw did.

After viewing the disputed facts in the light most favorable to the parties opposing the defendant's motion, *i.e.*, the plaintiffs, the Court finds that the "effect" of Mr. Beisenherz' action surrounding the purchase of ICH stock was to intentionally seek out parties in Arkansas for the purpose of, according to the plaintiffs, fraudulently inducing Stephens, and eventually Torchmark, to purchase stock. For the reasons more fully set out above, it matters not that Mr. Beisenherz was acting as an corporate officer. The reach of the Arkansas long-arm statute is sufficiently long to cover Mr. Beisenherz.

### D. Lewis & Ellis, Inc.

■ Defendant Lewis & Ellis, Inc. is a Texas corporation which prepares actuarial reports and evaluations for insurance companies or entities curious about the worth of an actuary oriented business or fund. It solicits business nation-wide. Over the past few years, it has done business in Arkansas with at least the following clients: Arkansas Blue Cross–Blue Shield, Providential Insurance Company, the Arkansas State Insurance Department, and the Union Life Insurance Company. The Court concludes that both the "nature and quality" of Lewis & Ellis, Inc.'s contacts with Arkansas, as well as the quantity of those contacts, are significant and point toward establishing the "minimum contacts" requirement. *Dakota Industries v. Dakota Sportswear*, 946 F.2d at 1390.

The Court also finds the relation of the cause of action to those contacts to be significant. Union Life was formally owned by Stephens. Lewis & Ellis, Inc. also prepared

an evaluation of ICH which it knew, if one believes the plaintiffs, would be made available to potential investors and utilized to make ICH's stock more marketable. In fact, that report was depended upon, in part, by the plaintiffs in deciding to purchase ICH stock.

The Court concludes that this nonresident defendant has "purposefully availed itself" of the privileges of conducting business in this state and will not now be heard to complain that a court sitting in Arkansas may not subject it to the court's jurisdiction. Lewis & Ellis, Inc.'s motion to dismiss for lack of jurisdiction will be denied.

## II. Venue

The defendants have also moved for dismissal pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, alleging improper venue. This case is founded only on diversity. Accordingly, the pertinent part of the venue statute reads as follows:

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, ....

Title 28 United States Code, Section 1391(a)(2).

The Court need not consider whether Northern District of Texas might also have been a district where "a substantial part of the events ... giving rise to the [plaintiffs'] claim occurred." *Id.* "Rather, we ask whether the district the plaintiff chose had a substantial connection to the claim...." *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir.1994). In this Court's view, the Eastern District of Arkansas clearly does.

Shaw and Beisenherz first met with Stephens, Inc. in Little Rock to negotiate the stock sale and did so more than once. Negotiations concerning the purchase of the stock also took place via phone and fax between Dallas and Little Rock. Those "long-distance" communications were as much "connected to" to one judicial district as the other. One of the alleged injured parties is headquartered here. The Court concludes that the Eastern District of Arkansas easily meets the requirement of being a place where a substantial part of this matter's events occurred. The Rule 12(b)(3) motions to dismiss are all denied.

## III. More Convenient Forum

Finally, the defendants have alternatively moved that this matter be transferred to the Northern District of Texas as a more convenient location for the parties and witnesses.

As mentioned at the outset of this order, defendants Rice and Shaw are citizens of Florida and defendant Beisenherz a citizen of Colorado. Thus, *none* of the individual defendants are from Texas. Defendant CNC is a Florida corporation, with its principal place of business in Kentucky. Only Lewis & Ellis, Inc. is a "citizen" of Texas. Plaintiff Stephens, Inc. is an Arkansas corporation, while plaintiff Torchmark is a Delaware corporation based in Alabama. Thus, of the seven or eight parties to this lawsuit (depending on whether one counts CFLIC), there is only one party from Texas, just as there is but one from Arkansas. That is not enough, in this Court's opinion, to disturb the deference normally granted to a plaintiff's decision to bring a matter where the plaintiff resides.

Furthermore, considering the convenience of the possible witnesses does nothing to tilt the scales in Texas' favor. Undoubtedly, many witnesses involved with Stephens could become involved in this case, just as there could be a large number of Texans associated with Lewis & Ellis, Inc. or ICH. The Court considers the witness factor to be a "wash."

Having found that no other legally significant factors which suggest Texas would be a better location for this action than Arkansas, the Court declines to override the plaintiffs' choice of venues and denies the motions to transfer. Furthermore, for the reasons set

180

out above, all of the motions to dismiss are denied as well.

IS SO ORDERED.