# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 06-3812/07-1210

_____

Dr. Deborah R. Coen,                        *
                                            *
            Appellant,                      *
                                            *   Appeal from the United States
      v.                                    *   District Court for the
                                            *   District of Minnesota.
Louis Coen; Daniel Coen; Anita              *
Ariella Coen; Carole M. Coen;               *
Nicholas Jackson Clark; Peter               *
John Bunker; Compayne (Hampstead)           *
Limited; Trustees of the Victor Coen        *
Will Trust; Trustees of the Miriam          *
Coen Will Trust; Trustees of the Estate     *
of Ms. Lily Coen; John Doe One;             *
John Doe Two,                               *
                                            *
            Appellees.                      *

_____

Submitted: October 5, 2007
Filed: December 10, 2007

_____

Before LOKEN, Chief Judge, RILEY and SMITH, Circuit Judges.

_____

RILEY, Circuit Judge.

Deborah Coen (Coen), a resident of Minnesota, brought an action against defendants who reside in England and France, claiming the defendants defrauded her father, Edward Coen (Edward), in connection with certain shares Edward owned in

a family-owned British company.  Finding no personal jurisdiction over the foreign defendants, the district court[1] dismissed Coen's lawsuit.  In these consolidated appeals, Coen now appeals the district court's decision.  We affirm.

## I.    BACKGROUND

This family controversy arises out of a dispute between two brothers over the value of their ownership interests in their parents' business, Compayne (Hampstead) Limited (Compayne), an English corporation with its principal place of business and all of its assets in England.  Victor and Miriam Coen (deceased) were citizens of Great Britain and were the parents of three children: Edward (now a citizen of Minnesota), Louis (now a resident of France), and Lily (deceased).[2]  After Victor and Miriam Coen died, all shares of Compayne were divided among their children.  Edward and Louis each owned approximately 42% of the outstanding shares, and Lily owned the balance.

In July 1994, Edward communicated to Louis his desire to liquidate his shares. In November 1994, Edward changed his mind and wanted to postpone the sale of his shares.  With respect to Edward's new decision to postpone the buyout, Louis wrote Edward stating:

> I understood in July that you wanted to cash-in your holding within the near future, so it is a sudden change that you want now to postpone it indefinitely.

---

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Susan Richard Nelson, United States Magistrate Judge.

[2]Lily was diagnosed with schizophrenia at about age 19, and she was institutionalized in Great Britain until her death in 2002.

In the mean-time I am stopping my work here on the project [the purchase of Edward's shares] until I know better what you want to do.

Edward wrote back stating:

I [am] willing to "accept" 36% of all Compayne assets (less Lily's share), giving you 48%. . . . Note: I do not expect to claim my share until perhaps 5 to 10 years from now.

Louis subsequently wrote:

I have done . . . a case study supposing that you wished to exercise your option to sell out today. . . . Some of the figures are exact, others are not.

[An] evaluation of the two properties (11/30/94) is £1,060,530 and we have approximately £200,000 in liquid assets. . . .

If we take into account Lily's holding, the shares would be redistributed as follows:

    Value Ed's shares   []= £449,740
    Value Lou's shares  []= £599,483
    Value Lily's shares  []= £211,777

Our liquid assets being around £200,000 we would have to take the decision to mortgage the property to borrow £249,740. . . .

An alternative solution of financing the buy-back would be to sell one of the properties, say the one in Compayne Gardens: Present day value of this property [] is £354,000.

Louis and Edward met in New York in late 1995 to discuss the sale of Edward's shares. The brothers agreed not to rush into any sale of Compayne's real estate

because they foresaw real estate values rising. After the New York meeting in December 1995, Edward wrote to Louis stating:

> I think your trip to New York was very useful . . . on further thought, I am not as confident that we can count on a substantial increase in [Compayne's real estate] value in the short term. One reason is that the market can go down as well as up. . . . I now feel strongly that we should proceed promptly to clear the decks of this issue [Edward's buyout]. . . . I would like to move toward an agreed document quite soon.

In January 1995, Louis wrote back saying:

> I was so speechless by your letter announcing the sudden turn-around on what we all agreed to in N.Y. one month ago . . . In July '94 you indicated that you wanted to cash in on your holding in the near future. . . . Five months later . . . you changed your mind and you no longer needed the money now but would like to have an option to sell in 5-10 years . . . After a great deal of work and expenditure [] this turned out to be impractical, and you then returned to your original request to sell-out of your holdings as soon as reasonably possible . . . This proved impractical also, and you agreed in NY to the 3 year plan. A month later you reneg [sic] on that plan and announce that you want to sell your shares now ignoring the difficulties and the prejudice for the other shareholders pointed out in NY.

Edward subsequently wrote Louis:

> I have been thinking some more about . . . changing the numbers in the direction that might make it more attractive from your point of view. . . . I am willig [sic] to take a further deduction in [my] share, from 36% to 33%. . . . I do want to clear the decks of this issue as soon as it reasonably can be accomplished.

Edward later met with his sons and informed them he effectively wanted to limit his claim to only 25% of the gross asset value of Compayne, which was approximately £300,000. Edward wrote to his sons stating:

> I have never really appreciated the magnitude of the effort that [Louis] has devoted over the last twenty five years to converting [one of Compayne's properties] from a zero profit rent controled [sic] enterprise into a high profit operation. . . . Moreover, during the last ten years of Miriam's life [Louis] had to manage all her financial affairs; oversee the details of the administration of her estate and oversee the selling of her house. And for the last fifteen years he has in effect serve[d] as a parent for Lily . . . [Louis] was carrying an unusual burden. . . . My number might be 42% of the shares, but my contribution to their value was zero. . . . My 42% of the shares grossly overstates my entitlement.

Edward's sons, acting as intermediaries, then related to Louis by facsimile that Edward wished to take 25% or approximately £300,000 for the shares. Edward's sons explained their father "was very upset" he and Louis "had quarreled," and was "anxious to resolve this on <u>any</u> terms simply to put the quarrel behind him."

Louis subsequently wrote Edward:

> We suggest that the transaction takes place in January or February, 1999. Is this O.K.? As to the current value, you proposed £300,000 . . . Do you still agree to this?

> Our agent [] gave a professional estimate [] of the property value based on current values of similar apartments in the same area. . . . We can ask for other evaluations.

In 1999, for approximately £285,000, the buyout of Edward's shares took place. In 2005, Coen filed an action against the defendants for fraud.[3] The family defendants reside in France, and the trustee defendants reside in England and France. Defendants countered with a motion to dismiss for lack of personal jurisdiction, and the district court granted defendants' motion.[4] This appeal followed.

## II.    DISCUSSION

We review de novo a motion to dismiss for lack of personal jurisdiction, and the nonmoving party needs only make a prima facie showing of jurisdiction. See Dakota Indus., Inc. v. Dakota Sportswear Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). If jurisdiction is controverted, the plaintiff has the burden of proving facts supporting personal jurisdiction. Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004). "The plaintiff's 'prima facie showing' must be tested, not by the pleading alone, but by the affidavits and exhibits presented with the motions and opposition thereto." Id. (quotation and citation omitted).

"A federal court may assume jurisdiction over [] foreign defendant[s] only to the extent permitted by the forum state's long-arm statute and by the Due Process Clause of the Constitution." Dakota Indus., Inc. v. Ever Best Ltd., 28 F.3d 910, 915 (8th Cir. 1994). Minnesota's long-arm statute confers jurisdiction to the fullest extent permitted by the Due Process Clause. Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006). The Due Process Clause requires "minimum contacts" between the nonresident defendant and the forum state before the court may exercise jurisdiction

---

[3]The parties do not dispute Coen's assertion that Edward assigned this action to her, thus, Coen is the real party interest.

[4]Although defendants filed their motion to dismiss also under Fed. R. Civ. P. 12(b)(6), (e), (f); Fed. R. Civ. P. 8; and a theory of forum non conveniens, "the parties [in their briefs] treated the matter as one of [personal] jurisdiction, and so will we." Radaszewski by Radaszewski v. Telecom Corp., 981 F.2d 305, 307 (8th Cir. 1992).

over the defendant.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980).

"Sufficient contacts exist when the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there, and when maintenance of the suit does not offend traditional notions of fair play and substantial justice." Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994) (quoting Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc., 950 F.2d 526, 528-29 (8th Cir. 1991)).  By defendant's reasonable anticipation, we mean "there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. at 818-19.  We have set "a five-part test for measuring minimum contacts: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." Id. at 819.  Factors one through three are primary.  With respect to the third factor, we distinguish between specific jurisdiction and general jurisdiction. Id.  "'Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state,' while '[g]eneral jurisdiction . . . refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.'" Id. (quoting Sondergard v. Miles, Inc., 985 F.2d 1389, 1392 (8th Cir. 1993).

Because Coen does not contend the basis for personal jurisdiction is the "continuous and systematic" contacts with the forum state, that is, general jurisdiction, Johnson, 444 F.3d at 956, we consider whether specific jurisdiction exists over the defendants.  In doing so, "[a]t a minimum . . . we will consider the last two of the primary factors—the nature and quality of the contacts, and [their] source and connection to the cause of action." Lakin v. Prudential Sec., Inc., 348 F.3d 704, 712 (8th Cir. 2003) (internal quotation marks omitted).

With respect to the nature and quality of the contacts by defendants (who reside in either England or France) with the forum state (Minnesota), the defendants virtually had no contact with the forum state. The only relevant contact was the correspondence between Edward and Louis, and the correspondence occurred only because Edward initiated the contact, expressing a desire to liquidate his shares. The brothers had only one personal business contact, and that contact occurred in New York, not Minnesota.[5]

With respect to the connection of the cause of action to the contacts, we cannot say this cause of action arises from or is related to the defendants' actions within Minnesota. The record simply does not disclose defendants, with the exception of Louis, communicated with Edward. Although Louis and Edward communicated several times via mail, those contacts occurred only because Edward sought to sell his shares in the foreign, family run business. The record shows Louis attempted to delay Edward from selling his shares, but Edward frequently changed his mind and eventually insisted upon selling his shares as soon as possible. Nothing in the record indicates Louis, or any other defendant for that matter, purposely availed himself of the privilege of conducting activities within Minnesota, and invoking the benefits and protections of Minnesota's laws. The defendants, including Louis, could not have reasonably anticipated being haled into a Minnesota court for this dispute over the English corporation's share valuation.

Furthermore, although Minnesota has an interest in providing a forum to its residents, it would be substantially inconvenient and extremely burdensome to require all defendants, and their witnesses, to travel from France or England to Minnesota to resolve Coen's allegations. The inconvenience to the parties, under the facts of this

---

[5]Some of the family defendants visited Minnesota on a few occasions during this time, but the visits were for a wedding, a fiftieth wedding anniversary, a hospital visit, and a funeral. None of these visits involved Compayne business or the buyout negotiations.

case, is a significant factor militating heavily against Coen for purposes of establishing personal jurisdiction over the foreign defendants. See St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 591 (8th Cir. 2001) ("Even if the minimum contacts threshold is established, personal jurisdiction may be defeated if its exercise would be unreasonable considering such factors as [] the burden on the defendant[s]").

In an effort to establish personal jurisdiction, Coen asserts defendants committed an intentional tort (fraud) warranting personal jurisdiction over the defendants. Coen's claim of jurisdiction is based on the "'effects' test that allows the assertion of personal jurisdiction over non-resident defendants whose acts are performed for the very purpose of having their consequences felt in the forum state." Finely v. River North Records, Inc., 148 F.3d 913, 916 (8th Cir. 1998) (referring to Calder v. Jones, 465 U.S. 783, 789 (1984)). Specifically, Coen alleges defendants provided false information regarding the assets of Compayne and Edward relied on this false information in his decision to sell his shares. The record indicates, however, Louis told Edward (a retired professor of economics) that additional evaluations of Compayne's assets could be obtained. The record also indicates Louis attempted to delay Edward from selling his shares. It was only when Edward insisted on selling his shares and set a price that a deal for the buyout of Edward's shares was executed. Coen fails to allege and demonstrate an intentional tort in which Minnesota would have a strong interest to remedy. Without deciding the merits of Coen's fraud claim, for our personal jurisdiction review, Coen's allegations fail to support sufficiently a claim of fraud with material consequences felt in Minnesota.

In a motion for relief from final judgment under Fed. R. Civ. P. 60(b), Coen claimed Edward did not know Lily's true interest in the company nor did he know the true assets of Compayne when he sold his shares. As the district court noted, the correspondence undisputedly indicates what Edward considered important were liquidity and tax consequences, as well as Louis's contributions to the company, and to the care of their mother, Miriam, and their sister, Lily. Furthermore, the

correspondence clearly establishes Edward set the price for the buyout.  Based on these relevant factors, we find no abuse of discretion in the district court's denial of Coen's Rule 60(b) motion.  See Noah v. Bond Cold Storage, 408 F.3d 1043, 1045 (8th Cir. 2005) (declaring a decision to grant or deny a Rule 60(b) motion lies with the district court, does not raise the underlying judgment, and is reviewed only for an abuse of discretion).

## III.    CONCLUSION

The district court properly granted defendants' motion to dismiss. We affirm the district court's thorough and well reasoned opinion and judgment finding no personal jurisdiction over the defendants.  Coen's claims are dismissed without prejudice.

_____